**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | |
|---|---|
| **In re:** | **Chapter 7** |
| **WALTER T. MYRTLE AND AMANDA M. MYRTLE,** | **Case No. 12-51281** |
| **Debtors.** | |
| **LAURA A. LE VAN-VOEGLER AND CHRISTOPH J VOEGLER,** | |
| **Plaintiffs,** | |
| **v.** | **Adversary Case No. 12-05074** |
| **WALTER T. MYRTLE AND AMANDA M. MYRTLE,** | |
| **Defendants.** | |

**MEMORANDUM OPINION DENYING PLAINTIFF'S ACTION FOR
DETERMINATION OF A DEBT AS NON-DISCHARGEABLE**

The Court held a trial on October 23, 2013, to consider Laura Le Van-Voegler and

Christoph Voegler's complaint seeking a determination that the debt allegedly owed to them by

Walter and Amanda Myrtle was non-dischargeable under 11 U.S.C. § 523(a)(2)(A). At the close

of Plaintiffs' evidence, the Myrtles moved the Court to strike Plaintiffs' evidence and find in

their favor. The Court will address this motion more fully below. Additionally, in the course of

examining Defendants' first witness, the Court was alerted to the fact that witnesses had

disregarded the Court's sequestration order. Based on the witness's candor, Defendants moved

the Court to strike the testimony of Plaintiffs' witnesses. The Court will address this motion

more fully under a separate order issued contemporaneously with this memorandum opinion.[1]

**JURISDICTION**

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334.

This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) to determine the dischargeability

of a particular debt. This Court may hear and determine core proceedings pursuant to 28 U.S.C. §

157(b), Fed. R. Bankr. P. 7056, and the Western District of Virginia District Court General

Order of Reference, dated December 6, 1994. The Myrtles are debtors in this Court, and the

Voeglers have voluntarily brought this section 523(a)(2)(A) action asking the Court to adjudicate

the merits of their complaint.

In addition to dischargeability, Plaintiffs ask this Court to resolve the underlying question

of liability, liquidate damages, and award punitive damages and attorney's fees. These issues are

integral and necessary issues that the Court must resolve before it may reach the merits of

Plaintiffs' non-dischargeability complaint.[2] As such, this Court joins the majority of courts in

concluding that the bankruptcy court has authority to adjudicate such issues as they relate to

dischargeability under 11 U.S.C. § 523(a). *See generally In re Deitz*, 469 B.R. 11 (9th Cir. BAP

2012) (holding that *Stern* does not preclude a bankruptcy court from liquidating a creditor's

claim through the non-dischargeability process); *In re Cowin*, 492 B.R. 858 (Bankr. S.D. Tex.

2013) (holding that liquidating state law claims against a debtor is closely integrated into the

---

[1]        Defendants' motion to strike Plaintiffs' witnesses' testimony is addressed by separate order of the Court because the Court finds that it is not necessary to the outcome and disposition of this proceeding.

[2]        At the conclusion of the hearing on Defendants' Motion for Summary Judgment, the Court requested that the parties submit briefs explaining whether the Court had the authority, in light of the Supreme Court's holding in *Stern v. Marshall*, to decide the underlying issue of liability and damages before determining whether such was dischargeable under 11 U.S.C. § 523(a). Summary Judgment Hearing Transcript at 42–43, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 52. After reviewing the parties' filings and the case law, the Court determines that it does have authority to decide these issues in connection with a determination under 11 U.S.C. § 523(a).

Code, is a necessary element to determining dischargeability, and, therefore, is not precluded by *Stern*); *In re Conley*, 482 B.R. 191 (Bankr. S.D. Ohio 2012) (holding that the bankruptcy court had the constitutional authority to enter a final judgment liquidating the creditor's claim before determining dischargeability); *In re Borich*, 464 B.R. 335 (Bankr. N.D. Ill. 2011) (holding that the authority to liquidate judgments in order to adjudicate non-dischargeability was not impaired by *Stern*). In the event that the Court lacks such authority, the findings of fact and conclusions of law related to such issues should be read as a report and recommendation to the reviewing court.

## DEFENDANTS' RULE 52(C) MOTION

At the close of Plaintiffs' evidence, the Defendants moved to strike Plaintiffs' evidence and requested a verdict in the Defendants' favor. Trial Transcript at 267, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 83, hereinafter "Trial Tr.". In so requesting, Defendants did not specify upon which rule of procedure they were relying, nor the standard the Court should employ in ruling on said motion. Plaintiffs, however, argued that Rule 50 of the Federal Rules of Civil Procedure applied and that the standard of review under Rule 50 is akin to that under summary judgment, which the Court had denied previously. *Id.* at 267–68. While Plaintiffs are correct regarding the standard of review under a Rule 50 motion, the Court concludes that Rule 52(c) of the Federal Rules of Civil Procedure is the correct rule to consider in light of Defendants' motion. *See* FED. R. BANKR. P. 7052 (incorporating FED. R. CIV. P. 52).

Rule 52(c) applies to non-jury trials, whereas Rule 50 applies in jury trials. The Advisory Committee's Note explains:

> [Rule 52(c)] parallels the revised Rule 50(a), but is applicable to non-jury trials. It authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence.

The new subdivision replaces part of Rule 41(b), which formerly authorized a dismissal at the close of the plaintiff's case if the plaintiff had failed to carry an essential burden of proof.

FED. R. CIV. P. 52 advisory committee's note. This proceeding did not involve the empanelling of a jury and Defendants have specifically requested judgment in their favor based solely on Plaintiffs' evidence. As such, Rule 52(c) and its standard of review apply to Defendants' motion.

Under Rule 52(c), the Court may grant Judgment on Partial Findings if a party has been fully heard on an issue, the Court finds against the party on the issue, and a favorable ruling on the issue is necessary for a judgment in the party's favor. *See* FED. R. CIV. P. 52(c). In considering such a motion, the Court is to assess and weigh the evidence presented and render judgment if the evidence is insufficient to support the claim or defense. *See Carter v. Ball*, 33 F.3d 450, 457 (4th Cir. 1994); *Cherrey v. Thompson Steel Co.*, 805 F. Supp. 1257, 1261 (D. Md. 1992); *Rawat v. Hamil (In re Hamil)*, 453 B.R. 812, 814 (Bankr. W.D. Va. 2011); *In re Modanlo*, 413 B.R. 262, 265 (Bankr. D. Md. 2009). No special inferences are to be made in considering the evidence; rather, the Court "is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." *Cherrey*, 805 F. Supp. at 1261 (quoting 9 C. Wright and A. Miller, *Federal Practice and Procedure* § 2371 (1971)). The Court's determination must be supported by specific findings of fact and conclusions of law. *In re Modanlo*, 413 B.R. at 266.

In this case, the Defendants have requested Judgment on Partial Findings under Rule 52(c). The Court must assess Plaintiffs' evidence and determine if it is sufficient to support a finding that the debt allegedly owed is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).[3] If it

---

[3]     Rule 52(c) permits the Court to decline ruling on a motion for Judgment on Partial Findings until the close of all evidence. *See* FED. R. CIV. P. 52(c). Because the Court reserved ruling on Defendants' motion and took the matter under advisement, as opposed to declining to rule on the motion, the Court believes that a full analysis under Rule 52(c) is proper despite the availability of Defendants evidence at this time. In the event the Court denied

is not, Defendants are entitled to judgment under Rule 52(c). Based on the evidence presented by

Plaintiffs at trial, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

### <u>Stipulated Facts</u>

The parties stipulated to the following facts:

1. Defendants filed a Chapter 7 bankruptcy petition with this Court on September 28, 2012.
2. Mr. Myrtle was issued a Class B contractor's license on February 13, 2007.
3. Mr. Myrtle's Class B contractor's license was revoked on April 3, 2012.
4. Plaintiffs entered into a contract with Serenity Pool & Spa for construction of a pool on June 25, 2011.
5. Serenity Pool & Spa was not a valid Virginia corporation at the time the contract was entered into by the parties.
6. Serenity Pool & Spa is listed as a contractor on the building permit application issued, and issued building permit.
7. Plaintiffs paid Defendants a total of $31,000.00.
8. Mr. Myrtle made a false statement on October 18, 2011, regarding the death of his grandfather.
9. On or about October 11, 2011, Mr. Myrtle last performed physical construction work on the project.
10. On or about November 1, 2011, Mrs. Voegler met at her residence with Darris Ritenour, owner/manager of Uncle D's Pools & Spas, LLC, to discuss issues relating to the Voegler's pool project with Serenity Pool & Spa.
11. On or about November 21, 2011, Plaintiffs entered into a contract with Uncle D's Pools & Spas, LLC, for construction of a pool at Plaintiffs' residence.

Trial Tr. at 4 – 9.

### <u>Plaintiffs' Witnesses and Exhibits</u>

Plaintiffs brought forth six witnesses to help establish the facts necessary to their case.

Plaintiffs called their witnesses for three purposes generally. The first four witnesses largely

testified as to facts relevant to Plaintiffs' fraud in the inducement theory of liability and non-

dischargeability. Mr. Myrtle testified as an adverse witness. Mrs. Voegler testified generally as

---

Defendants' motion, the Court would consider the case under all the evidence before it. Review of Defendants' evidence, however, is not necessary, as the Court finds that grounds exist to grant Defendants' motion for Judgment on Partial Findings. Were the Court to consider Defendants' evidence, however, the Court believes that the evidence presented by Defendants would only strengthen the Court's holding that Plaintiffs have failed to carry their burden.

to the facts relevant to Plaintiffs' actual fraud theory of liability and non-dischargeability, and as to the series of events that transpired in this case. Because the witnesses' testimony deal with distinct and separate events, as well as different theories of Plaintiffs' case, the Court believes it most expeditious to organize the findings of fact by witness and corresponding relevant exhibits.

### Testimony of Mr. Ritenour

Mr. Ritenour is the owner of Uncle D's Pools & Spas, LLC and has been installing pools since 1986. Trial Tr. at 35. In August 2011, Mr. Myrtle met Mr. Ritenour at the Shenandoah County Fair and asked if he would have any interest in buying Mr. Myrtle's business or inventory. In the course of that conversation, Mr. Myrtle represented that he was planning to go out of business sometime in the future, but did not indicate that he was in fact going out of business. *Id.* at 37. Mr. Ritenour, however, did not find Mr. Myrtle's desire to exit the business unusual and confessed that some days, he has the same thoughts. *Id.* at 58.

Mrs. Voegler contacted Mr. Ritenour sometime prior to November 2011 and requested that he come to her residence to inspect the ongoing pool project. Trial Tr. at 39. In November, Mr. Ritenour went to the Voeglers' home and inspected the pool site. *Id.* at 42. Upon inspecting the project, Mr. Ritenour discovered what he believed to be concerns with the pool, such as bowing of the walls, un-level stairs, missing bracing, an insufficiently poured footer, and other missing elements that should have been completed before Mr. Myrtle filled the pool with water. *Id.* at 39, 42.  The most serious of these issues was the insufficient concrete footer around the pool. *Id.* at 48. Mr. Ritenour's testimony was that the footer should have been eight to twelve inches deep, but the footer poured by Mr. Myrtle was only one to two inches. *Id.* With a footer of this depth, it was Mr. Ritenour's testimony that the pool would fail. *Id.* at 48–49. Despite the perceived problems, however, all the work completed by Mr. Myrtle on the Voegler's project

had passed all applicable inspections required by the Warren County Inspections Department to that point of construction, including a footer inspection on August 8, 2011. *Id.* at 63–65; Exhibit 11 at 8, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 60. Furthermore, the worries Mr. Ritenour had over the bracing related to additional requirements imposed by the pool manufacturer beyond those imposed by the county inspection. Trial Tr. at 65. The bracing successfully passed inspection by all applicable local building code standards. *Id.*

### Testimony of Mr. Weiner

Mr. Weiner entered into a contract with Serenity Pool & Spa on August 22, 2011, for the purchase and installation of a pool. Trial Tr. at 75; Exhibit 19, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 60, hereinafter "Pl's Ex. 19". Serenity Pool & Spa never finished his pool. Trial Tr. at 75. Rather, Mr. Weiner received an e-mail from the Defendants in January 2012 essentially stating that they were out of money and would be in touch. *Id.* at 79, 95. The Defendants filed for Chapter 7 relief in this Court approximately nine months later. Up until that communication, however, Mr. Weiner believed Defendants would be back in the spring of 2012 to finish his pool project, as the parties had agreed. *Id.* at 95.

In connection with Mr. Weiner's project, Defendants completed the following construction by or on October 28, 2011: excavated the site, set the walls and perimeter of the pool, installed plumbing and conduit for electrical, backfilled behind the walls, and set forms for concrete. Trial Tr. at 76. On October 28, 2011, Mr. Weiner submitted a change order and the corresponding payment to Mr. Myrtle and never saw him again, although the two would have further communications sporadically throughout the winter. *Id.* at 76–79.

In exchange for the work performed, Mr. Weiner paid Serenity Pool & Spa a total of $45,016.00, which represented payments for draws one through four of the contract and a change order. Trial Tr. at 89; Pl's Ex. 19 at 2. With the exception of the change order made on October 28, 2011, Serenity Pool & Spa completed all construction necessary to entitle them to payment of draws one through four of the contract.[4] Defendants, however, did not request payment for draws five and six of the contract. Trial Tr. at 89. Although the Court finds it of little relevance to how the Voeglers were to make payments under their contract, Mr. Weiner paid draw one and the change order by personal check, as permitted by the contract, appears to have paid draw two by cashier's check, as permitted by the contract, but was unsure as to whether draws three and four were by personal or cashier's check. *Id*. at 105–09.

Serenity Pool & Spa worked on Mr. Weiner's pool throughout September and October of 2011. During that time, heavy rain occurred on a number of days, one of which required Serenity Pool & Spa to pump water from the excavated pool area. Trial Tr. at 91, 93. According to Mr. Weiner, each time Defendants said they could not work on his project because of rain that day, it had indeed rained that day or the day before. *Id*. at 91.

### Testimony of Mr. Crichfield

Mr. Crichfield entered into a contract with Serenity Pool & Spa on June 8, 2008, for the purchase and installation of a pool. Trial Tr. at 114; Exhibit 17, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 60, hereinafter "Pl's Ex. 17". According to Mr. Crichfield, Serenity Pool & Spa never completed its obligations under the

---

[4]       According to the contract, Serenity Pool & Spa was entitled to draw one upon execution of the agreement; draw five days before installation or along with draw one; draw three on the day walls were set; and draw four on the day backfilling was completed. Exhibit 19 at 2, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 60. According to Mr. Weiner's testimony, Serenity reached each of these milestones. Trial Transcript at 76, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 83, hereinafter "Trial Tr.".

contract. Trial Tr. at 115. In Mr. Crichfield's words, "It's the most expensive pond [he's] ever seen." *Id.* at 145.

As of September 26, 2008, Serenity Pool & Spa had completed the following construction on Mr. Crichfield's pool: excavated the site, installed the fiberglass shell, surrounded the shell with gravel, installed plumbing, installed a filtration system, and filled the fiberglass shell with water. Trial Tr. at 117–18. As of December 2008, no additional work had been completed. *Id.* at 120. According to Mr. Crichfield, he and Mr. Myrtle agreed to wait until warmer weather to lay the concrete around the pool and Mr. Crichfield believed Mr. Myrtle would be back in March to do that. *Id.* at 120–21. But Mr. Myrtle did not return in March or any time thereafter. *Id.* at 121. Although communications were attempted in the interim, the parties did not speak again until June 2011, and after that brief conversation, never again. *Id.* at 129.

In connection with the work completed on Mr. Crichfield's project, Mr. Crichfield paid Serenity Pool & Spa $37,376.00. The payment represented the deposit upon execution of the agreement and payment for delivery of the pool to the installation location. Trial Tr. at 115–16; Pl's Ex. 17. Defendants completed each milestone entitling them to these payments.

In addition to the $37,376 paid to Defendants, Mr. Crichfield made two additional payments to Defendants: one on September 26, 2008, for $800 and another on October 31, 2008, for $8,894. Trial Tr. at 118–19; Pl's Ex. 17. According to Mr. Crichfield, these two payments were made at the request of Mr. Myrtle and were advance payments for the purchase and installation of concrete to be laid around his pool. Trial Tr. at 118–19. The memo line of those checks, however, made no reference to the purchase of concrete despite the fact that Mr. Crichfield had carefully labeled each check presented to Defendants; rather, the $800 check references "3rd draw on Swimming Pool" and the $8,894 check references "3rd Contract

Pay/upgrade filter/[unreadable, but not concrete]." Pl's Ex. 17 at 4–7. It is unclear whether the

contract included concrete. Trial Tr. at 138. The contract references a four-foot concrete pad, and

yet, the contract includes a credit of $3,000.00 for concrete. *Id.* at 138 – 39; Pl's Ex. 17 at 1. It

was Mr. Crichfield's belief that the credit was merely for doing business. Trial Tr. at 139. Had

the contract not included concrete, Mr. Crichfield's failure to have concrete installed would not

have prevented Defendants from collecting the final draws of $800 and $8,544 under the

contract. Pl's Ex. 17 at 1. Whether Serenity Pool & Spa breached the Crichfield contract is not

before the Court. For purposes of this opinion, the Court merely finds that there is a genuine

question regarding whether Serenity breached the Crichfield contract.

### Testimony of Mr. Love

Mr. Love entered into a contract with Serenity Pool & Spa on September 10, 2010, for

the purchase and installation of a pool. Trial Tr. at 150; Exhibit 16, *Voegler v. Myrtle (In re*

*Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 60, hereinafter "Pl's Ex. 16".

Serenity Pool & Spa never finished his pool. Trial Tr. at 151. After consultation with an attorney,

Mr. Love, through counsel, informed the Defendants in early September 2011 not to return to the

jobsite. *Id.* at 167.

In connection with the contract, Serenity Pool & Spa completed the following

construction on the Love's pool by or on December 2, 2010: excavated the site, installed the

fiberglass shell, and supplied the pump equipment. Trial Tr. at 152–53. As of December 2010,

Serenity had not yet poured concrete around the pool, but the weather was too cold to complete

this stage. *Id.* at 155. The parties agreed that Defendants would return to pour the concrete

sometime in the spring of 2011, but Defendants did not return until August of 2011. *Id.* at 155,

159. It was at this time that Defendants had the tracking for the pool cover installed. *Id.* at 159.

However, the cover itself could not be installed until the concrete had been poured. *Id.*

Furthermore, during the three months leading up to the installation of the tracking, there had

been problems with the pool cover company. *Id.* at 165. When the installers arrived to install the

cover, the parts were not correct. *Id.* at 165–66. Additionally, a pool cover had been delivered to

the site, but it was not the correct cover and a new cover had to be ordered. *Id.* Following the

installation of the pool cover tracking, after not hearing from the Defendants for some period of

time, Mr. Love through counsel told Serenity Pool & Spa not to come back to the project. *Id.* at

154–55, 167.

        In connection with the work completed on Mr. Love's project, the Loves paid Serenity

Pool & Spa a total of $43,740.00, which represents a $1,000 deposit, an $8,708 payment upon

arrival, a $26,124 payment for delivery of the pool, and a $7,908 payment when the pool was

ready for decking. Trial Tr. at 152–54; Pl's Ex. 16. Mr. Love made all payments by December 2,

2010. Trial Tr. at 154. The Loves did not make the final $800 payment that was due upon

completion of the project, and the Myrtles never provided a $600 retaining wall called for by the

contract. *See* Trial Tr. at 148–170; Pl's Ex. 16 at 1. Based on Mr. Love's testimony, Serenity

Pool & Spa completed work necessary to entitle it to three of the four payments – the deposit

through payment for delivery of the pool. Trial Tr. at 152–53; Pl's Ex. 16 at 1. Although Mr.

Love made the fourth payment, required when the pool was ready for decking, according to his

testimony, it is questionable that the pool was ready for decking because, according to Mr.

Love's communications with the Prince William County permit office, no electrical permits had

been issued and the electrical work around the pool had not been inspected. Trial Tr. at 169.

### Testimony of Mr. Myrtle

Much of the testimony elicited from Mr. Myrtle by Plaintiffs involved attempts to discredit Mr. Myrtle's credibility as a witness, as well as attack the timing of when Serenity Pool & Spa began having financial difficulties. In particular, Mr. Myrtle admitted lying to the Voeglers regarding his grandfather's death in order to buy himself a week or two to complete Mr. Weiner's pool to a particular point before returning to the Voegler's project. Trial Tr. at 176–77. Additionally, Plaintiffs brought to light, and Mr. Myrtle testified, that a letter to the Shenandoah County Circuit Court, in connection with the parties' state court proceedings, contained a misrepresentation of fact.[5] *Id.* at 179–81.

During his testimony, Mr. Myrtle provided a brief synopsis of how the pool business operates that the Court finds notable. Based on Mr. Myrtle's uncontroverted testimony, after excavation and installation of the pool, the ground needs to sit for four to five weeks before concrete can be poured. Trial Tr. at 184. If the concrete is poured immediately after the pool is installed, there is a risk that the concrete will be structurally unsound. *Id.* ("[The installed pool] had to be setting on the ground for four to five weeks before you go back in and pour concrete or else you risk structural integrity to the actual concrete itself."). It is during this resting period that the pool installer moves on to the next job, constructs the next project to the resting point, and while the second or possibly third project is resting, returns to the initial project to pour the

---

[5]      The Myrtles are not the only party in this action to have made affirmative misstatements of fact in documents filed with a court. In this action and the state court proceeding against the Myrtles, the Voeglers have represented, in numerous filings and hearings with this Court and the Shenandoah County Circuit Court, that the Myrtles "knowingly and falsely represented that Serenity was a valid corporation . . . ." Complaint at 5, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 1; Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment at 3, 6, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 45; Exhibit 9 at 4, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 60. Based on Mrs. Voegler's testimony at trial, Defendants made no such representation. All that was represented to Mrs. Voegler was from Mrs. Myrtrle who said that Serenity was a family company, and Mrs. Voegler assumed, based partially on internet research, that a family company meant Serenity was a corporation or an LLC. Trial Tr. at 246–47, 253–55. The Court was expecting testimony by Mrs. Voegler to the contrary, and such an expectation formed a basis, in part, for the Court's decision to deny Defendants' motion for summary judgment. Memorandum Opinion Denying Defendants' Motion for Summary Judgment, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 66. Had the Court been aware of the facts as presented at trial, that decision to deny Defendants' motion may have been different.

12

concrete. *Id.* at 184–85 ("During that settlement time is when you move to the next job, not

before and not after."). Defendants had reached the resting period with the Voegler's project and

had moved on to the Weiner project. *Id.* Due to heavy rains during September, Defendants were

unable to complete the Weiner project to the resting point in the normal course. *Id.* at 176–77,

184–85. Because Defendants were delayed with the Weiner project, the Voegler project was

delayed beyond the normal resting period as a result. In fact, it took until October 28, 2011 for

Defendants to complete the Weiner project to the resting point. *Id.* at 186.

### Testimony of Mrs. Voegler

The Voeglers' entered into a contract with Serenity Pool & Spa on June 25, 2011, when

they tendered a $1,000.00 deposit. Trial Tr. at 212–13. The Voelgers physically delivered the

signed contract to Mr. Myrtle on August 3, 2011. *Id.* at 213. Serenity Pool & Spa never

completed the project, and on November 21, 2011, the Voeglers entered into a contract with

Uncle D's Pools & Spas, LLC to complete the project. *Id.* at 236.

The Voeglers did not hear from Defendants after October 31, 2011. Trial Tr. at 234. As

of that date, the following work had been completed pursuant to the contract: excavated the site,

set the walls and perimeter of the pool, laid the vermiculite, installed the liner, and filled the pool

with water. *Id.* at 221–22. In fact, this work had all been completed by August 12, 2011; only

nine days after Serenity had commenced construction. *Id.*

In connection with the construction of their pool, the Voeglers paid Serenity Pool & Spa

a total of $31,000.00, which included the contract price of $26,900.00 and a change order

totaling $4,000.00. Trial Tr. at 212, 217; Exhibit 2 at 2, 6, *Voegler v. Myrtle (In re Myrtle)*, No.

12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 60, hereinafter "Pl's Ex. 2".  Under the

terms of the contract and the work completed on the Voeglers' project, Serenity was entitled to

be paid all but the final draw on the contract. Trial Tr. at 221–22; Pl's Ex. 2 at 2. This final draw

totaled $2,590.00 and was to be paid when concrete was completed. *Id.*

On August 3, 2011, Mrs. Voegler delivered the signed contract along with a $6,475.00

personal check to Mr. Myrtle. Trial Tr. at 213. Per the terms of the contract, the $6,475.00

payment and all remaining payments were to be paid by cash or cashier's check. Pl's Ex. 2 at 2.

Mrs. Voegler was aware of this requirement, but believed that because she had paid the deposit

by personal check, she was permitted to make all payments by personal check. Trial Tr. at 257–

58. The contract permitted the Voeglers to make only the deposit by personal check. Pl's Ex. 2 at

2. The contract further provided that if cash or cashier's check was not received for scheduled

payments, work may be delayed and a fee of 1.8% may apply. *Id.*

Mr. Myrtle called Mrs. Voegler later on August 3, 2011, and told her "the bank was

going to place a ten to fourteen day hold on the check;" "[the Voeglers] needed to provide cash

or cashier's check;" "by the time the funds are going to be good I will have your project

completed;" and "if he didn't have the funds available [the Voeglers'] pool was going to be

placed on hold and he did not know when he was going to be able to put it back in the queue."

Trial Tr. at 214–15. Per Mrs. Voeglers' testimony, however, Mr. Myrtle never asked for the

contract to be paid in full and never asked for payment upfront. *Id*. at 215, 240–41. Rather, Mrs.

Voegler understood Mr. Myrtle's statements, many of which were restatements of contractual

terms, to mean that if he was paid in full and in certified funds, the pool would be done in two

weeks. *Id*. at 215 ("Q: Did he, did he tell you if he could have the pool done within two weeks if

he was paid in full? A: That's how I took it, yes . . . . Q: Okay. And you understood his statement

to mean what you just said. That if you gave him certified funds he would have the pool done in

two weeks, correct? A: Correct."); *id.* at 240–41 ("Q: Did Mr. Myrtle ever ask you up front and

14

say I want a check for $30,000.00? I want you to pay me up front for this job? A: No . . . . He

said by the time the funds are available I will have your pool complete. Q: All right. But he never

said pay me now? A: He didn't say pay me now, I'll get it done faster, no.").

After finishing the work outlined above, Serenity attempted to schedule August 22, 2011,

as the date when the concrete forms would be placed. Trial Tr. at 222. The Voeglers, however,

were on vacation at that time and did not allow Serenity to work while they were away. *Id.* Due

to the vacation and commencement of the Weiner's pool, Mr. Myrtle told Mrs. Voegler he would

be back to lay out the concrete forms and pour the concrete after Labor Day. *Id*. at 243. Serenity

Pool & Spa did not return to the Voeglers' project until October 11, 2011. *Id*. at 226. At that

time, Serenity moved dirt from one location on the property to another. *Id*. at 226–27. Serenity

would not return again, and the parties did not communicate after October 31, 2011. *Id.* at 233–

34.

## CONCLUSIONS OF LAW

### Elements for Non-Dischargeability under 11 U.S.C. § 523(a)(2)(A)

Under section 523(a)(2)(A) of the Code, a debt is non-dischargeable in bankruptcy if it is

for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent

obtained, by . . . false pretenses, a false representation, or actual fraud, other than a statement

respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A) (2013). In

determining dischargeability under section 532(a), the Court is required to employ a two-step

process. *Stanbrough v. Valle (In re Valle)*, 469 B.R. 35, 43 (Bankr. D. Idaho 2012) (citing *Banks*

*v. Gill Distrib. Ctrs., Inc. (In re Banks)*, 263 F.3d 862, 868 (9th Cir. 2001)) (holding that

determinations under § 523(a) involve a two-step process). First, the Court must determine

whether the debt has been established. *Id.* Second, it must determine the nature of the debt –

dischargeable or nondischargeable – under section 523(a)(2). *Id.*

### Burden of Proof

Generally, a creditor must prove his case under 523(a)(2)(A) by a preponderance of the

evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). In *Grogan*, however, the Supreme Court

distinguished between the burden a creditor has in establishing liability on a claim against a

debtor and the burden that same creditor has in avoiding dischargeability of that claim. *Id.* at

283. The general preponderance of the evidence standard only applies to the latter. *Id.* at 284.

The burden of proof to establish liability on a claim – *i.e.* the existence of a debt[6] – is determined

through reference to state law.[7] *Id.* at 283. *See also*, *In re Valle*, 469 B.R. at 43.

In an effort to establish liability on their claim, Plaintiffs have alleged causes of action in

tort for fraud in the inducement and actual fraud. Plaintiffs' burden of proof as to these causes of

action is determined by reference to Virginia law. Under Virginia law, actual fraud and fraud in

the inducement, when sounding in tort, require proof by clear and convincing evidence. *Clark v.*

*Small*, 74 Va. Cir. 534, *3 (2006) (citing *Davis v. Marshall Homes*, 576 S.E.2d 504, 506 (Va.

2003) (*res judicata* ruling superseded by legislative enactment)). Therefore, before the Court can

determine whether the alleged debt owed Plaintiffs is non-dischargeable, Plaintiffs must establish

the existence of a debt under applicable state law, which in this case is by clear and convincing

evidence.

### Determining Liability

---

[6]     *See* 11 U.S.C. § 101(12) (2013) (defining "debt" as liability on a claim).

[7]     At the hearing, counsel for the Plaintiffs argued that the general preponderance of the evidence standard
applied to all issues before the Court under section 523(a)(2)(A), including Plaintiffs' burden of proving liability on
a claim. Trial Tr. at 22–23. After reviewing the case law, the Court does not find Plaintiffs' arguments persuasive
regarding what burden to impose.

Before determining whether the debt is dischargeable, the Court must consider whether Plaintiffs have established the existence of liability on their claim. *In re Valle*, 469 B.R. at 43. Plaintiffs carry the burden of proving liability. *Id.* Plaintiffs have alleged two causes of action sounding in tort: fraud in the inducement and actual fraud.[8] Complaint, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 1, hereinafter "Compl.". Either cause of action alone may be sufficient to establish liability. Therefore, the Court will consider each cause of action separately.

### Fraud in the Inducement

Under Virginia law, fraud in the inducement requires a showing of a "false representation of a material fact, constituting an inducement to the contract, on which the [other contracting party] had a right to rely . . . ." *Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 489 (Va. 2010); *see also*, *Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 293 (Va. 2007). When sounding in tort, fraud in the inducement requires a showing that the representation made pertained to a present, pre-existing material fact; not merely unfulfilled promises or statements as to future events. *Abi-Najm*, 699 S.E.2d at 489. An intent not to perform a promise, when made, however, is a misrepresentation of a present, pre-existing fact. *Id.* at 490 (quoting *Boykin v. Hermitage Realty*, 360 S.E.2d 177, 178 – 79 (Va. 1987) (quoting *Lloyd v. Smith*, 142 S.E. 363, 365 – 66 (Va. 1928))). As such, to succeed in proving a cause of action sounding in tort for fraud in the inducement, a plaintiff must establish by clear and convincing evidence the following

---

[8]        Plaintiffs' actual fraud cause of action is styled in Count III as "False Representation of Completion Within 14 Days." Complaint at 7, *In re Myrtle*, No. 12-05074, ECF No. 1. Based on the allegations made by the Plaintiffs, the Court has interpreted the Plaintiffs' Count III as an allegation of actual fraud. Constructive fraud involves a false representation of a material fact made innocently or negligently. *Prospect Development Co. v. Bershader*, 515 S.E.2d 291, 297 (Va. 1999); *see also*, *Jefferson Standard Life Ins. Co. v. Hedrick*, 27 S.E.2d 198, 202 (Va. 1943). Plaintiffs have alleged that Mr. and/or Mrs. Myrtle knew the representation they were making was false. As such, Plaintiffs have alleged actual fraud, as opposed to constructive fraud, because actual fraud encompasses false representations of material fact made intentionally or knowingly.

elements: (1) a false representation of a present, pre-existing material fact; (2) reliance; and (3)

inducement to enter the contract.

<u>False Representation of a Present, Pre-Existing Material Fact</u>

The Voeglers' complaint alleged that Defendants knowingly and falsely represented that

Serenity: (1) "was a valid corporation authorized to perform construction work in the

Commonwealth of Virginia;" and (2) "had the ability and desire to perform the terms of the

Contract." Compl. at 5. Plaintiffs informed the Court that they would not be presenting evidence

on statement (1). Evidentiary Hearing Transcript at 70–71, *Voegler v. Myrtle (In re Myrtle)*, No.

12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 86. As the Court has noted in a footnote to

its Findings of Fact, the Voeglers' allegation in statement (1) was not an accurate portrayal of the

facts. Without statement (1), Plaintiffs' cause of action for fraud in the inducement rests on

whether Defendants made a false representation of a present, pre-existing material fact when

they represented that Serenity had the ability and desire to perform the terms of the contract.

The intent not to perform a promise, when made, is a false representation of a present,

pre-existing material fact. *Abi-Najm*, 699 S.E.2d at 490. Plaintiffs' theory of the case is that

Defendants never had any intention to perform their obligations under the contract. Therefore,

Defendants' representation that they had the ability and desire to perform is a false representation

of a then-existing material fact. The Court previously ruled that, if proven, this theory of the case

was a valid and viable theory of liability. Memorandum Opinion Denying Defendants' Motion

for Summary Judgment at 13, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va.

Dec. 21, 2012) ECF No. 66.

To prove their case under this theory, Plaintiffs presented four witnesses – Mr. Ritenour,

Mr. Weiner, Mr. Critchfield, and Mr. Love – to establish a common plan or scheme by which

Defendants received payment in full without fulfilling their obligations under the contract. The general idea is that Defendants construct the project to the point where it is ready for concrete, receive full compensation for the project, abandon the site, and refuse to answer requests for completion. Under Plaintiffs' theory, Defendants' intention was to receive full payment while doing minimal work, and not complete the project.

As the adage goes, correlation is not causation. Although the Crichfield, Love, and Weiner projects were all completed to the same general degree, the three are distinguishable from one another and from the Voegler's project.

Serenity stopped working on the Crichfield project when the project was ready for concrete. As the Court noted in its findings of fact, it is disputable whether the Crichfield contract required Serenity to provide concrete. If the contract did not include concrete, then Serenity would have completed all its obligations under the agreement and been entitled to payment of the contract in full. Without a breach of the agreement, let alone an intentional breach, the Crichfield project does not suggest that a scheme existed. Furthermore, the Crichfield project started in 2008, approximately three years prior to the contract between Serenity and the Voeglers. If the Crichfields were victims of the same scheme in 2008, why has no action been taken until now?

Serenity left the Weiner project when it was ready for concrete. There are two major differences between the Weiner project and the Voegler project. First, Mr. Weiner never paid the full contract price; rather, he only made payments for work that was ultimately completed. Mr. Myrtle never demanded or requested upfront payment of the contract price on the Weiner project, nor the Voegler project. Whereas Mr. Weiner chose to pay Serenity per the payment schedule in the contract, the Voeglers chose to pay Serenity all at once. Second, Mr. Weiner

agreed to put his project on hold for the winter and was the unfortunate victim of Serenity's

closing. Based on the weather delays and timing, it is difficult for the Court to determine that

Serenity had an intent not to perform when it entered the Weiner project. If Serenity was

planning not to perform the contract in full, it seems likely they would have abandoned ship at

some point during the six weeks of constant rain delays that prevented them from moving on to

other projects.

Like the Weiner and Crichfield projects, Serenity only completed the Love project to the

point where it was ready for concrete. Unlike the Voeglers, Mr. Love made payments to Serenity

based on the payment schedule in the contract and paid all but the $800 due on completion of the

project. According to Mr. Love's testimony, Serenity was entitled to the payments made with the

exception of the final payment of $7,908.00. According to him, Serenity claimed the pool was

ready for decking in December 2010, but he learned in August 2011 that an electrical permit had

not been issued and any electrical work that had been done to that point had not been inspected.

Whether the electrical permit or electrical inspection was a condition precedent to the pool being

ready for decking, is not for the Court to decide; rather, based on the facts presented, it appears

Serenity had arguable grounds for receiving that payment.

Furthermore, the delay in work between December 2010 and May 2011 was by mutual

agreement of the parties. The further delay in work being performed between May 2011 and

August 2011 was the result of manufacturer issues with the pool cover and associated tracking

mechanism. After the tracking and cover difficulties, the Loves decided to hire counsel and told

Serenity not to return. Serenity was making progress when it was thrown off the project,

although at an understandably frustrating pace. Like the Weiner project, however, if Serenity had

no intention of performing its final obligations under the contract, they probably would not have

spent three months trying to rectify the problems of the pool cover and tracking gear and would simply have disappeared after December 2010.

In further support of this general scheme, Plaintiffs presented the testimony of Mr. Ritenour, the owner of Uncle D's Pools and Spas, LLC. Mr. Ritenour, in part, testified as to the perceived defects in the Voeglers' pool as of November 1, 2011. In particular, Plaintiffs stressed that Serenity provided a one- to two-inch footer around the pool. According to Mr. Ritenour, such footer was insufficient, would result in the structural failure of the pool, and required increasing the footer's depth to eight to twelve inches. Plaintiffs specifically presented this evidence so the Court could infer that if Defendants did not "put in the most fundamental part of the project," then "[Defendants] never really intended to do this project from the beginning." Trial Tr. at 44. The Court, however, is unable to make this inference. According to Mr. Ritenour's testimony, the footer was not required to pass inspection once poured.[9] If the footer was truly so fundamental to the structural integrity of a pool, it seems unlikely that it would not need to pass inspection. Rather, the footer was something required by the manufacturer. *See* Exhibit 12 at 1, *Voegler v. Myrtle (In re Myrtle)*, No. 12-05074 (Bankr. W.D. Va. Dec. 21, 2012) ECF No. 60. To be clear, Serenity did install a footer around the base of the pool. Neither Mr. Ritenour, nor Plaintiffs, provided the Court with any evidence that the manufacturer required the footer to be greater than one to two inches. Based on the evidence presented by Plaintiffs, Mr. Ritenour is the only person who required that the footer be eight to twelve inches deep.

---

[9]     According to the Department of Professional and Occupational Regulation's findings, Warren County approved a footer inspection on Building Permit #BLD462-2011 in connection with the Voeglers' project. Assuming Mr. Ritenour's testimony is correct, this inspection must have been the pre-pour inspection. If Mr. Ritenour's testimony is incorrect, however, then the footer installed by Serenity passed inspection and the Court's inability to make such an inference would be strengthened.

Based on the evidence presented by Plaintiffs, the Court is unable to conclude that a scheme existed by which the Defendants entered into contracts without any intention to perform, did minimal work, received full compensation, and then abandoned the project. The Court would be hard pressed to conclude that Defendants even breached the Crichfield, Love, or Voegler contracts under the terms of those agreements; let alone find that Defendants clearly and convincingly schemed to defraud their customers.[10] The only commonality between all the projects is that Serenity did not perform once it was time to lay concrete. Such a coincidence is not sufficient to show a scheme. Furthermore, what little coincidence exists is called into doubt by Plaintiffs' witnesses' failure to abide by the Court's order not to discuss the case.

Plaintiffs must establish by clear and convincing evidence that Defendants made a false representation of a present, pre-existing material fact. The intent not to perform a promise, when made, is a false representation of a present, pre-existing material fact. Plaintiffs' fraud in the inducement cause of action rested on Defendants' representation that Serenity had the ability and desire to perform. Plaintiffs chose to prove the falsity of this statement by reference to a common scheme that, if proven, established Defendants never intended to perform. Plaintiffs, however, have failed to establish the existence of such a scheme, and, therefore, have failed to prove the falsity of Defendants' representation that they had the ability and desire to perform. Without such a finding, the Plaintiffs cannot establish that Defendants made a false representation of a present, pre-existing material fact. Such a showing is necessary for Plaintiffs' fraud in the inducement cause of action to succeed. Because Plaintiffs' evidence is insufficient to support an

---

[10]    It is unclear whether the Defendants were required to provide Mr. Crichfield with concrete; Section 8.17 of the Voegler's contract with Serenity states, "If the Owner refuses to permit the Contractor to proceed with the work described herein, then the contract will be considered completed . . . .;" and Plaintiffs have not provided a complete copy of the Love's contract (it is missing the terms on the back page) and it is unclear what recourse Defendants may have had for being thrown off the job.

essential element of their cause of action, Defendants are entitled to judgment in their favor

under Rule 52(c) as to Plaintiffs' fraud in the inducement cause of action.

## Actual Fraud

As with fraud in the inducement, actual fraud requires a showing of a false representation

of a present, pre-existing material fact. *Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 297

(Va. 1999). In addition, the plaintiff must show that the representation was made intentionally or

knowingly with intent to mislead. *Id*. The statement made must be relied upon by the party

misled, and, as a proximate result, must result in damage to said party. *Id*.; *see also*, *Jefferson*

*Standard Life Ins. Co. v. Hedrick*, 27 S.E.2d 198, 202 (Va. 1943) ("The law is well settled that if

one represents as true what is really false, in such a way as to induce a reasonable man to believe

it, and the representation is meant to be acted on; and he to whom the representation is made,

believing it to be true, acts on it, and in consequence thereof sustains damage, there is such fraud

as will support an action."). Therefore, to succeed under a theory of actual fraud, the plaintiff

must establish by clear and convincing evidence: (1) a false representation of a present, pre-

existing material fact; (2) made intentionally or knowingly; (3) with intent to mislead; (4)

reliance by the party misled; and (5) resulting in damage to the party misled.

### False Representation of a Present, Pre-Existing Material Fact

The Voeglers' complaint alleges, "Debtors obtained the $31,000 payment from Plaintiffs

by making the false representation that it would take fourteen (14) days for the Plaintiffs'

payment to clear, and falsely representing that they would have the Project completed within

fourteen (14) days."[11] Compl. at 8. The complaint further alleges that Defendants knew the

representation to be false because "they had no intention to perform the Contract and knew that it

---

[11]     Plaintiffs paid Defendants $1,000.00 prior to the alleged statements, and, therefore, Defendants could have
only obtained $30,000.00 as a result of the alleged statements.

could not be completed within fourteen (14) days." *Id*. The Voeglers further argued, at trial, that but for the fact "the representation was made to her that the pool would be done in fourteen days if [Mr. Myrtle] was given $30,000.00 of certified funds," the Voeglers would never have given Defendants $30,000.00. Trial Tr. at 14. The Court will consider each statement.

The Voeglers have failed to provide the Court with any evidence regarding the truth or falsity of the statement "it would take fourteen (14) days for the Plaintiffs' payment to clear." *See generally,* Trial Tr. 1–267. Without any evidence as to the falsity of this statement, the statement cannot form the basis of Plaintiffs' actual fraud cause of action.

The remaining alleged representations appear, essentially, to be one in the same. For the sake of completeness, however, the Court will address each as if they were independent statements.

With respect to the representation argued at trial, the Court finds that no such representation was ever uttered, despite Plaintiffs' representation to the contrary. Trial Tr. at 13 ("[W]hile he doesn't come out and demand that she pay the entire amount, he's like I can do the pool in fourteen days *if you pay me in certified funds for the amount of the contract*." (emphasis added)). According to Plaintiffs' own testimony, Mr. Myrtle never asked for the contract to be paid in full and never asked for payment in advance of work performed. *Id.* at 214–15, 240–41. Instead, Mrs. Voegler interpreted Mr. Myrtle's request that the first draw be paid by certified funds prior to commencing construction to mean that if he was paid in full and in certified funds, the pool would be done in two weeks. *Id.* at 215 ("Q: Did he, did he tell you if he could have the pool done within two weeks if he was paid in full? A: That's how I took it, yes . . . . Q: Okay. And you understood his statement to mean what you just said. That if you gave him certified funds he would have the pool done in two weeks, correct? A: Correct."). Mrs. Voeglers'

understanding of statements cannot create an affirmative false representation. A
misunderstanding of statements made, as opposed to an affirmative false representation, is not
sufficient to prove actual fraud.

The Court is left to analyze whether Mr. Myrtle's alleged statement that the project
would be completed within fourteen days was a false representation of a present, pre-existing
material fact. The statement, by itself, is not a false representation of a present, pre-existing
material fact because the statement is merely an opinion as to when a future event may occur. In
an effort to prove their case, Plaintiffs have alleged that Defendants had no intention to perform
under the contract and knew the project could not be completed in fourteen days. Compl. at 8.
Plaintiffs' theory is that Defendants made a promise that, when made, they had no intention of
keeping. If proved, an intent not to perform a promise, when made, would be a false statement of
a present, pre-existing material fact. *Abi-Najm*, 699 S.E.2d at 490. As such, Plaintiffs' scheme
theory must be analyzed again as of August 3, 2011, the date the statement was uttered, rather
than June 25, 2011, the date the contract was formed.

For the reasons outlined above in connection with the Court's analysis of Plaintiffs'
fraud in the inducement cause of action, the Court cannot find that on August 3, 2011, a scheme
existed in which Defendants had no intention to perform under the contract. Plaintiffs have
highlighted on several occasions that Mr. Myrtle admitted to the DPOR that he intentionally and
unjustifiably failed to complete the Voeglers' contract. Mr. Myrtle's admission that he
intentionally and without reason did not finish the Voeglers' project is direct evidence of his
intent at the time of the breach, but without more, tells us little about his intent on August 3,
2011.

Additionally, Plaintiffs presented evidence that Mr. Myrtle expressed a desire to sell his business and inventory around the same time he began working on the Voeglers' project. Plaintiffs' theory is that if Mr. Myrtle wanted to sell the business, then he must not have had the intent to complete the Voeglers' project. The Court does not find this evidence or argument persuasive. First, Plaintiffs only provided that the statement was made to Mr. Ritenour at some time in August of 2011. Trial Tr. at 37. Unless the statement was made on August 1 or 2, 2011, the statement provides little, if any evidence of Mr. Myrtle's intent when he told Mrs. Voegler on August 3, 2011, that the project would be completed in fourteen days. Second, a desire to exit a business does not imply necessarily an intent not to perform one's current obligations. Such a statement is just as likely, if not more so due to potential liability, to imply a desire to wrap up the affairs of the business in an acceptable manner before exiting. Third, Mr. Ritenour stated that such a desire was common in the pool business and a sentiment he has shared at various times in his career.

Based on the evidence presented by Plaintiffs, the Court finds that the likeliest explanation for this entire case is that Serenity had every intention to complete the Voeglers' project, but the delays associated with the Weiner project resulted in an unfixable situation for the Defendants. The Voeglers justifiably grew frustrated with the delays, and Mr. Myrtle's less than reasonable responsiveness, and decided to proceed with a different contractor. It is an unfortunate situation, but the evidence presented by Plaintiffs does not lead the Court to believe that Defendants had the intent not to complete the project on August 3, 2011.

Plaintiffs have failed to establish an intent not to perform a promise when made. Without such intent, Mr. Myrtle's statement that the project would be completed in fourteen days cannot be a false representation of a present, pre-existing material fact. A false representation is the

initial and bedrock element of Plaintiffs' actual fraud cause of action. It is a necessary element

that Plaintiffs have failed to prove by clear and convincing evidence. Because Plaintiffs'

evidence is insufficient to support an essential element of their cause of action, Defendants are

entitled to judgment in their favor under Rule 52(c) as to Plaintiffs' actual fraud cause of action.

## CONCLUSION

Plaintiffs have failed to establish liability on a claim. Without liability on a claim,

Plaintiffs cannot show that Defendants owe them a debt. The existence of a debt is an essential

element of Plaintiffs' section 523(a)(2)(A) action. Moreover, Plaintiffs' evidence is insufficient

to support a finding that the debt allegedly owed is non-dischargeable under 11 U.S.C. §

523(a)(2)(A).[12] Therefore, Defendants' Rule 52(c) motion should be granted and Defendants are

entitled to judgment in their favor on partial findings. A contemporaneous order consistent with

this memorandum opinion will be entered. Copies of this memorandum opinion shall be sent to

the Plaintiffs, Plaintiffs' counsel, Defendants, and Defendants' counsel.

Date: December 17, 2013

Rebecca B. Connelly
U. S. Bankruptcy Judge

---

[12] Plaintiffs have suggested that the Court should follow the precedent of *Pleasants v. Black (In re Black)*, an unpublished Fourth Circuit opinion. 914 F.2d 1490 (4th Cir. 1990) (unpublished table decision). Plaintiffs have argued that the Fourth Circuit in *Pleasants* found that under similar facts the debt owed by the debtor-defendant was non-dischargeable. Plaintiffs' characterization of that case, however, is not entirely accurate. In *Pleasants*, the Fourth Circuit affirmed the District Court's finding that the Bankruptcy Court had made clearly erroneous findings of fact and conclusions of law. *Id.* at *2. The District Court, after reviewing the record, had determined that the Bankruptcy Court neglected several misrepresentations equating to actual fraud and erroneously concluded that the debtor-defendant had not committed embezzlement under 11 U.S.C. § 523(a)(4). The Fourth Circuit's opinion, however, provides no guidance or insight to this Court; rather, it merely says the District Court correctly determined that the Bankruptcy Court missed something in a similar case. With the lack of substance and the opinion's unpublished character, the Court does not find the opinion to be controlling or persuasive in this case.